David **KELLY** and William Kelly, Individually and trading as Kelly's Bustleton Esso, Plaintiffs,

v.

**GENERAL MOTORS CORPORATION** et al., Defendants.

Civ. A. No. 73–51.

United States District Court, E. D. Pennsylvania.

Dec. 31, 1976.

Mitchell A. Kramer, Philadelphia, Pa., for plaintiffs.

Ira P. Tiger, Philadelphia, Pa., for General Motors Corp.

Robert C. Heim, Philadelphia, Pa., for Ford.

Robert S. Ryan, Philadelphia, Pa., for Chrysler and Amer. Motors.

### OPINION AND ORDER

HUYETT, District Judge.

Plaintiff William Kelly has filed this monumentally ambitious antitrust suit against all four American automobile manufacturers. Kelly is the sole proprietor[1] of Kelly's Bustleton Exxon Station in Northeast Philadelphia, and he seeks to represent in this lawsuit a nationwide class of all automobile repair entities other than defendants' authorized new car dealers.[2] In an earlier Memorandum and Order we denied plaintiff's motion for class certification without prejudice. We ruled that it was impossible to exercise informed discretion under the circumstances where plaintiff's

antitrust theories were so indistinctly defined that identification of the substantive issues was impossible. Plaintiff was allowed discovery limited to the class certification issue and he was permitted to renew his motion, after sharpening his claims for relief. Now, following three oral arguments and the filing of numerous briefs during which time plaintiff's claims have undergone a remarkable transformation, we deny plaintiff's motion in all respects.

Kelly's Bustleton Exxon is a three-bay gasoline service station that is located at the well-travelled intersection of Bustleton Avenue and Red Lion Road in a residential area of Philadelphia. By his own account, Kelly's service station is a rather ordinary, reasonably prosperous enterprise, typical of thousands of others in the United States. He estimates that he has about 100 regular gasoline customers and 500 regular service customers, most of whom he draws from a three to five mile radius around his station. He derives his income principally from the sale of gasoline and from performing various maintenance and repair services for automobiles. In 1972 his gross revenue was about $205,000. Of that amount, $150,000 was derived from the sale of gasoline and $35,000 from the sale of parts and labor. A significant portion of the service-related revenue is attributable to performing the routine and periodic state inspections required of all cars registered in Pennsylvania. However, Kelly characterizes the majority of his service revenue as stemming from repair work consisting of engine tuneups, and the replacement of starter motors, alternators and water pumps. In addition to repair work, he performs air conditioning service and he is equipped and eager to do front end alignments and engine analyses. There are, however, some automobile repairs which he either declines to perform or "farms out" to specialty repair shops. For example, he does not engage in body and

---

1. At the time the complaint was filed, William Kelly was in partnership with his brother David who was named as a co-plaintiff. The partnership has since been dissolved and plaintiff's counsel reports that David Kelly is no longer a party to this lawsuit.

2. Plaintiff informs us that there are 300,000 class members. Of that amount, about 180,000 are operators of gasoline service stations and the balance are businesses that perform only repairs, specialty repair shops, and chain stores that operate an automobile repair business.

fender work, transmission overhauls, glass repair, or valve head grinding and cleaning.

## I. PLAINTIFF'S THEORIES

Plaintiff's grievances, as they have evolved,[3] concern two relatively distinct aspects of the auto manufacturer's marketing policies. The first segment of Kelly's complaint concerns the policy of all four defendants to sell their new automobiles under the coverage of a warranty. This warranty, typically a limited one under which defendants agree to repair defects in materials and workmanship for a stated period of time or miles, is included in the price of the car. Plaintiff attacks this practice as a tying arrangement, forbidden by Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff maintains that the defendants use their economic power with respect to new cars to force new car buyers to purchase warranty coverage from them also. The unstated premise apparently is that the new car warranty is a service contract which ought to be sold separately from the new car so that interested entrepreneurs can enter the new car warranty market and compete with the auto manufacturers in the sale of warranty contracts. Plaintiff seeks only to enjoin this purported tie-in arrangement, and he seeks certification of a Rule 23(b)(2) class.

The second segment of plaintiff's complaint attacks the defendants' marketing policies with respect to original equipment replacement parts. For purposes of this case, the parties appear to agree that the automobile replacement parts market is bisected in one important respect. On the one hand, there is an "after market", encompassing those replacement parts for which there is sufficient demand to warrant entry into the market by parts manufacturers other than the big four auto manufacturers. On the other hand, there is a "dealer market", representing replacement parts

manufactured only by the defendants, which auto repair businesses must resort to in order to perform certain repairs. It is this "dealer market" for original equipment replacement parts which is the target of a multi-faceted antitrust attack by the plaintiff.

Plaintiff alleges that the defendants sell their original equipment parts only through their authorized dealers. Thus the dealers act both as retailers and as wholesalers. When they purchase parts from the defendants for use in their own auto repair operations they act as retailers, selling parts to the ultimate consumer. When they purchase parts for resale to other auto repair businesses—members of plaintiff's proposed class—they act as wholesalers. In this distribution scheme the plaintiff discerns at least three antitrust violations.

Plaintiff first complains of price discrimination in violation of § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a). Section 2(a) forbids a seller from discriminating in price between purchasers of similar goods where the effect of the price differential may be to reduce competition between the favored and disfavored customers. Kelly claims that he is an indirect purchaser of replacement parts from the auto manufacturers and that at least as to some parts he purchases from dealers, he pays a higher price than do competing new car dealers who sell the parts in their retail capacity as auto repair businesses.

The second aspect of plaintiff's replacement parts attack is the refusal to deal theory. Plaintiff contends—and defendants steadfastly deny—that the auto manufacturers sell parts only to their authorized new car dealers, and that they refuse to sell any parts to members of the proposed class. This marketing policy is claimed to violate the antitrust laws on two levels.[4] On the

---

**3.** As we understood the case, plaintiffs originally alleged that defendants unlawfully tied warranty repair work to the sale of the new car, claiming that they were sellers of that service who were foreclosed from that market by the tying arrangement.

**4.** Plaintiff has mentioned from time to time a price-fixing theory. This strand of the refusal to deal theory is so poorly developed—when it is mentioned at all—that we do not consider it part of the case. In any event, since it is part of the refusal to deal theory, which plaintiff has no standing to litigate, see Part IV, infra, we need not consider it for purposes of class action certification.

one hand, Kelly's pleadings and briefs perceive a grand conspiracy among all four defendants to refuse to sell their own parts to anyone other than their own authorized dealers. This group boycott, plaintiff contends, is a per se violation of § 1 of the Sherman Act, citing *Klors Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Radiant Burners Inc. v. Peoples Gas & Light Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (per curiam). Alternatively, Kelly asserts that the defendants individually pursue their refusal to deal policies in an attempt to monopolize the distribution market for their own parts.

## II. THE TIE–IN CLAIM

■ Plaintiff seeks to enjoin the defendants' policy of including limited warranty coverage in the price of the new automobiles they sell. On the theory that a new car warranty is a service contract that is separable from the car that it covers, Kelly maintains that this is an unlawful tying arrangement. Because Kelly seeks no damages on this claim he requests certification of a class under Rule 23(b)(2). In seeking certification of a (b)(2) class, a plaintiff need only satisfy the court of the mere existence of common issues, and he avoids the most common stumbling blocks to certification of (b)(3) classes—showing that the common issues predominate over individual ones and showing that class treatment is superior to individual prosecution of the claims. There obviously does exist the common question of whether or not the defendants' warranty policies violate the antitrust laws. According to plaintiff, then, class certification should not be frustrated by the so-called commonality or predominance barriers. We do not believe the issue is quite that simple because Kelly's tie-in claim raises substantial, if not insurmountable, standing problems in our view. Although these problems are not readily adaptable to conventional Rule 23(a) analyses, we believe that the sound exercise

of our discretion militates against certifying this class.

■ Tying arrangements are per se illegal because they have a pernicious anticompetitive effect in two respects. In the first place, the coerced buyer of the tied product is deprived of the option of either choosing between a spectrum of similar products offered by other sellers or not buying the product at all. Secondly, other sellers of the tied product are denied access to the market for the tied product for reasons unrelated to quality or price. *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Unquestionably, then, coerced buyers of the tied product, see *Ungar v. Dunkin' Donuts*, 531 F.2d 1211 (3d Cir.) cert. denied, —— U.S. ——, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), and other sellers of the tied product have standing to challenge a tying arrangement under Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff and the class he seeks to represent do not claim standing as unwilling buyers of new car warranties. They do, however, assert a right to challenge defendants' warranty practices as prospective sellers of warranties. Alternatively, Kelly alleges that automobile repair businesses can maintain this action as the inevitable beneficiaries of warranty repair work, once the sale of warranty contracts is freed up from the exclusive grip of the defendants.

We address the latter claim first. Under the defendants' prevailing warranty practices, the buyer of a new automobile receives from the manufacturer a limited warranty, insuring the car against certain defects in materials and workmanship. Should the buyer discover a defect the defendants promise to repair or replace it free of charge, but all such warranty service must be performed by defendants' authorized dealers. When an authorized dealer performs a warranty repair for the new car buyer, he sends proof of the repair to the manufacturer, who reimburses the dealer for his services. This procedure deprives members of the proposed class of access to

the market for warranty repair work, which Kelly alleges he is equipped to perform. If the tie-in of the warranty contract to the sale of the new car were enjoined, the theory goes, automobile repair businesses would receive some of the warranty repair business that is now the exclusive preserve of defendants' authorized dealers.

We believe plaintiff and his class lack standing under this scenario to press their tie-in claim, since their theory of prospective economic benefit is too indirect and speculative. As the Second Circuit stated in *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 933, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971):

". . . a plaintiff must allege a causative link to his injury which is 'direct' rather than 'incidental' or which indicates that his business or property was in the 'target area' of the defendant's illegal act. These terms do not provide talismanic guides to decision, but they do indicate the need to examine the form of violation alleged and the nature of its effect on plaintiff's own business activities." [Citations omitted]

The economic benefit to class members that Kelly believes will follow an injunction of defendants' current warranty practice is so indirect and so speculative as to deny them standing to attack the alleged tying arrangement. Section 16 of the Clayton Act, 15 U.S.C. § 26, confers a private right of action for injunctive relief "against threatened loss or damage by a violation of the antitrust laws . . . under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . ." Courts have rejected an open-ended interpretation of the private right of action provisions of the Clayton Act that would permit suits "for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972). Instead, they have read into the language of the statute the "threshold question of standing." *Cromar Co. v. Nuclear Materials and Equipment Corp.*, 543 F.2d 501, 506 (3d Cir. 1976).[5] In the *Cromar* case the Third Circuit adopted the language of the Ninth Circuit, reading § 4 of the Act to confer standing only upon "those individuals whose protection is the fundamental purpose of the antitrust laws." *Cromar,* supra at 506, quoting *In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 125 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). In determining whether a plaintiff is one "whose protection is the fundamental purpose of the antitrust laws" we must consider: (1) the nature of the proposed new car warranty market; (2) the relationship of the plaintiff to the alleged violators; and (3) the effect of the antitrust violation upon the plaintiff. See *Cromar*, supra at 506. In this case the factors weigh heavily against Kelly and his proposed class. If the defendants were enjoined from tying warranties to the sale of the car and began selling them as an add-on item, new car buyers could choose among three options: they could buy the manufacturers warranty coverage at extra cost, they could choose to forgo warranty protection, or they could shop for other warranty contracts. In these circumstances, interested entrepreneurs might investigate the possibility of entry into the market. Since warranty contracts are in the nature of risk insurance, it is fair to say that barriers to entry into the market would be very high and the range of interested competitors would be severely limited. Indeed it is quite possible that no business enterprise could be induced to enter the market. Even if one or more well-financed enterprises did enter the market, plaintiff and members of his class would have no assurance that warranty repair work would fall to any of them. Furthermore, the defendant manufacturers selling

---

**5.** We recognize that the *Cromar* case was decided under the private damage action provision of § 4 of the Clayton Act and not the private injunction provision of § 16. However, we believe that the "loss or damage" threshold of § 16 and the "injury to business" concept of § 4 are functionally equivalent for purposes of the standing inquiry.

their optional warranties would still be free to insist as a condition of the contract that the repair work be done by their authorized new car dealers. Likewise, new competitors in the sale of warranties could condition the free repairs available under their warranty contracts upon performance of that service by certain designated automobile repair shops. There is no assurance that any identifiable segment of Kelly's proposed class would be designated to perform that work. In short, neither Kelly nor any member of his class has standing to challenge defendants' warranty policies as the probable recipients of warranty repair business if the tying arrangement were enjoined.

Kelly asserts standing to challenge the defendants' new car warranty policies on a second basis as a prospective seller of new car warranties. As noted above, actual sellers of the tied product have standing as persons "whose protection is the fundamental purpose of [tying law]." *Cromar*, supra at 506. Nobody other than defendants presently "sell" new car warranties because of the alleged tying arrangement. But that situation does not render these alleged tying arrangements immune from antitrust attack, for, if it did, successful monopolists could operate with impunity. A plaintiff who is not currently in the business of selling new car warranties will have standing if he can prove (1) an intention to enter the new car warranty market, and (2) preparations for entry into the market. *Fleer Corp. v. Topps Chewing Gum, Inc.*, 415 F.Supp. 176, 179 (E.D.Pa.1976). In response to our inquiries at oral argument concerning the seriousness with which plaintiff was pressing this aspect of his standing argument, Kelly filed an affidavit (Document # 71), attesting to his readiness and willingness to "sell automobile warranties if such warranties become available as such." (¶ 3). Although we could quibble with the facial sufficiency of the affidavit, we shall accept for purposes of this motion its adequacy and truth. We would be remiss, however, if we did not view as downright quixotic the suggestion that a service sta-

tion operator should represent a class of some 300,000 automobile repair businesses, most of them small scale operations, in a suit in which they seek to enjoin the practice of American automobile manufacturers to include a warranty in the price of the car on the theory that, if there were no illegal tying arrangement, they would sell new car warranties themselves. While we cannot say with assurance that no class members intend to and are prepared to begin selling warranties, we do observe that many are most unlikely to swear out an affidavit like Kelly's. The sale of warranties is a risk underwriting business far removed from the world of retail gasoline sales and car repairs, and it would be a most unusual business enterprise that seeks to combine the two. The defendants have vigorously challenged Kelly's standing to raise the claim, and, though we accept his standing for the moment, we have every reason to believe that the defendants during the liability phase of this case will challenge the standing of each and every class member on this point. Although Kelly proposes a Rule 23(b)(2) class certification, where the predominance of individual questions is not ordinarily a proper concern, individual questions exist in this case going to the root requirement, see, e. g., *Dolgow v. Anderson*, 43 F.R.D. 472, 491 (E.D.N.Y. 1968), that class boundaries be defined with a fair degree of certainty. A class defined as all automobile repair businesses other than defendants' authorized dealers is only a superficially certain class definition, because there is no readily apparent causal nexus between status as a car repair business and the claim that car warranties are illegally tied to the sale of the car. In order for any class member to be entitled to litigate the liability of the defendants for the tie-in of warranties, he will have to show his intention and preparedness to begin selling warranties. Thus, membership in the class will be impossible to determine until after a trial on the merits as to each of 300,000 proposed class members, and in our view the utility of the class action device would be defeated.

## III. THE PRICE DISCRIMINATION CLAIM

■ Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) makes it an antitrust violation for a seller to discriminate in price between purchasers of similar goods where the effect of the price differential is to adversely affect competition between the favored and the disfavored customer. Plaintiffs claim that they purchase some replacement parts indirectly from the defendant automobile manufacturers at higher prices than new car dealers must pay for the same parts. Putting aside the substantial problems that this theory poses on the merits,[6] we believe that § 2(a) price discrimination claims under the Robinson-Patman Act are manifestly ill-suited to class action treatment.

■ In order to satisfy his burden of demonstrating the desirability of proceeding as a class action under Rule 23(b)(3) plaintiff must satisfy us that common questions of law and fact predominate over individual ones. Plaintiff's prima facie case requires proof that: (1) defendants charge plaintiff a higher price—through their dealers *qua* wholesalers—than they charge their dealers *qua* retailers for the same part; (2) that each individual plaintiff is in competition with dealers in the retail sale of replacement parts to consumers; (3) that the price differential adversely affects competition between the dealer and the plaintiff in the retail sale of parts; and (4) that the class member lost profits as a consequence. In this case at least the last three elements require individual proof, and individual questions clearly are predominant. If Kelly's proposed class were certified on the § 2(a) claim the trial would be an endless, fragmented series of inquiries—some 300,000 in number—into the experience of each class member in the purchase and sale of original equipment replacement parts.

■ We reject the suggestion by plaintiff that his damages will be the amount of the price difference. In *Enterprise Industries, Inc. v. Texas Co.*, 240 F.2d 457, 458 (2d Cir.), cert. denied, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957), the leading case on damages in price discrimination suits, the Second Circuit overturned a plaintiff's verdict premised on an overcharge theory of damages. Applying the principles of *Enterprise Industries* to this case, the liability of the defendants for price discrimination would not be established unless Kelly and his fellow class members could individually demonstrate that the higher prices they paid for original equipment replacement parts caused them to lose profits to competing new car dealers. It is entirely possible that some or all of the class members pass on the higher price to their customers with no attendant diversion of business to the competing new car dealers who charge lower prices for the same parts. In any event, it is clear that proof of both liability and damages would entail mini-trials focusing on the conditions of 300,000 original equipment replacement parts markets. That prospect is mind-boggling.[7]

---

**6.** The plaintiff's claim that the defendants discriminate in price between members of the class and their dealers *qua* retailers is based on the indirect purchaser doctrine. By its terms, § 2(a) of the Robinson-Patman Act forbids a seller from practicing price discrimination "between different purchasers." The longstanding view of the Third Circuit is that only one who purchases directly from the defendant-seller may maintain a cause of action for price discrimination. *Klein v. Lionel Corp.*, 237 F.2d 13, 15 (3d Cir. 1956). We note, however, that some other courts have rejected this restrictive view of the Act. *E. g., FLM Collision Parts, Inc. v. Ford Motor Co.*, 406 F.Supp. 224, 236–39 (S.D.N.Y.1975), rev'd. on other grounds, 543 F.2d 1019 (2d Cir. 1976).

**7.** Other district courts have similarly concluded that price discrimination suits are ill-suited to class action treatment. See, e. g., *Gulf Wandes Corp. v. General Electric Corp.*, 62 F.R.D. 377 (E.D.La.1974); *Albertson's, Inc. v. Amalgamated Sugar Co.*, 62 F.R.D. 43 (D.Utah, 1973) modified on other grounds, 503 F.2d 459 (10th Cir. 1974); *Bel Air Markets v. Foremost Dairies*, 55 F.R.D. 538 (N.D.Cal.1972). Plaintiff relies on *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791 (10th Cir. 1970), the only price discrimination case to our knowledge which has sanctioned the certification of a price discrimination class action. The Court in *Gold Strike* assumed the existence of competition between the favored and disfavored customers, which

## IV. REFUSAL TO DEAL CLAIMS

We need not consider in detail the various facets of Kelly's refusal to deal claims. It is sufficient to note that he alleges that the defendants refuse to sell original equipment replacement parts to anyone other than their authorized dealers. Plaintiff Kelly candidly admitted in his deposition that he had never sought to purchase parts directly from the defendants rather than through their dealers *qua* wholesalers of parts. Moreover, there is no suggestion that had he attempted to purchase parts from the automobile manufacturers he would have been rebuffed regardless of the price he would pay and the volume he would purchase. He testified as follows: (Kelly Dep., 115–16)

Q. Have you ever sought to buy parts from any source that refused to sell you parts?

A. Yes.

Q. Who?

A. Cardo, Incorporated.

. . . . .

Q. Is there any other place where you sought to buy parts of some sort and were denied the right to buy them?

A. Not to my recollection. No.

At another point in the deposition he reaffirmed that testimony. In response to questions about ¶ 12(a) of the complaint which charged that defendants conspired "[t]o refuse to sell parts to plaintiffs and members of their class at all or on terms and at prices sold to others," plaintiff testified:

Q. Who refused to sell parts to you?

A. No one.

Q. Who refused to sell parts to anybody else?

A. I don't know. (Kelly Dep., 281)

In addition to these express statements concerning his failure to inquire about the prospect of direct sales of parts to him, Kelly's description of the nature of his business and the frequency of his purchases of such parts is corroborative. As the owner of a gasoline service station, Kelly is not himself primarily a seller of replacement parts, although he does sell parts to his customers at a profit incidental to his repair work. When that repair work dictates the need for a replacement part, he takes that part from his inventory, if he stocks it, or he buys it from auto suppliers if he does not. Since original equipment replacement parts are never required in his repair work he turns first to one of the several independent auto supply businesses he patronizes that sell parts manufactured by independent manufacturers. Only when the required part is one not manufactured and stocked by others does he turn to original equipment replacement parts, manufactured by defendants and sold by defendants' authorized new car dealers. That narrow category of replacement parts tends to be those which cannot profitably be manufactured by independent manufacturers. Quite logically, then, Kelly's demand for original equipment parts tends to be sporadic and unpredictable. In these circumstances, it is easy to understand why the owner of a service station who only occasionally needs parts would not be particularly interested in purchasing directly from any manufacturer.

We conclude from Kelly's candid and unequivocal admissions that, aside from the price he pays for parts, he is genuinely indifferent to the replacement parts distribution policies of the defendants. He therefore is not a person "injured in his business or property by reason of" unlawful refusals to sell parts to him, and he lacks standing under § 4 of the Clayton Act, 15 U.S.C. § 15 to bring a private treble damage suit for redress of his claim. Since Kelly lacks standing to mount the challenge in his own behalf, he is foreclosed from representing members of the proposed class who may well have a justiciable refusal to

---

we respectfully suggest is improper, especially in view of the recent admonition of the Court of Appeals in *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir.), cert. denied, —— U.S. ——, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), that plaintiffs may not shortcut elements of proof in class action cases.

deal claim against the defendants. *Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).