Larry D. ABERNATHY, et al., Plaintiffs,

v.

BAUSCH & LOMB INCORPORATED, et al., Defendants.

Civ. A. No. CA3–80–0205–D.

United States District Court,
N.D. Texas,
Dallas Division.

March 15, 1983.

Jack N. Price, Austin, Tex., for plaintiffs.

James E. Coleman, Jr., George Kryder, III, Dallas, Tex., and John Stuart Smith, Harold A. Kurland, Rochester, N.Y., for defendant Bausch & Lomb.

## ORDER

ROBERT M. HILL, District Judge.

This is an action brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, by 261 optometrists from ten states. These plaintiffs have sued defendants Bausch and Lomb Inc., Pearle Vision Centers, Inc., G.D. Searle and Co., and Cole National Corp., for alleged violations of the antitrust laws. The plaintiffs, already large in number, seek to pursue their claim as a class action on behalf of a much larger nationwide class of optometrists, ophthalmologists, and dispensing opticians. They filed a motion for class certification, which was countered by a cross-motion from the defendants to deny class certification as a matter of law. This case is presently before the Court on the defendants' cross-motion.

The violations alleged by the plaintiffs chiefly involve a scheme whereby Bausch and Lomb, a major producer of soft contact lenses and accessories, purportedly provided secret rebates on the price of its products to the other defendants, large chains of optical service centers, in order to gain or retain their business. The plaintiffs propose to represent a class consisting of all optome-

trists, ophthalmologists, and dispensing opticians in the United States who purchased soft contact lenses from Bausch and Lomb during the four-year period preceding institution of the suit to the present, and who have been required to pay prices higher than the prices paid by the other named defendants or others who are in competition with the class members in the resale of the lenses, by reason of illegal rebates or other discriminating practices of Bausch and Lomb. According to plaintiffs, there are about 26,000 optometrists in the United States and a comparable number of ophthalmologists and dispensing opticians. They further state that Cole, Searle, and its subsidiary Pearle Vision operate extensively throughout the United States, and are in competition with a substantial number of these optometrists, ophthalmologists and opticians, although the exact number cannot yet be determined.

In order to be certified as a class in an action for damages such as this one, plaintiffs must demonstrate that they satisfy the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Defendants contend that the plaintiffs cannot satisfy the requirements of Rule 23(b)(3) as a matter of law. For the reasons set forth below, this Court has concluded that it agrees with the defendants, and that their motion to deny class certification should be granted.

I. *Plaintiffs' Allegations*

At the outset it is necessary to focus our vision on the factual allegations and legal theories that form the basis of the plaintiffs' complaint, before the class certification question can be considered. *Cf. Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 312–15 (5th Cir.1978). These may be summarized as follows.

According to the complaint, the plaintiffs are optometrists who have purchased soft contact lenses and accessories from defendant Bausch and Lomb during the four-year period prior to the commencement of their suit. Bausch and Lomb is the dominant producer and distributor of soft contact lenses in the nation. It sells its products to laboratories, individual optometrists and ophthalmologists, and large chain store operations which provide certain optometric services. The other named defendants—G.D. Searle, Pearle Vision, and Cole—come within this latter category.

Plaintiffs contend that Bausch and Lomb achieved its position of market dominance early in the history of the marketing of soft contact lenses. Although viable competitors have since eroded the initial monopoly Bausch and Lomb held, Bausch and Lomb still retains its dominance. Plaintiffs say it is estimated that Bausch and Lomb has a market share of 40–60 percent in the original fitting of soft lenses. Its market share in the replacement market is even greater, and is estimated at 90 percent.

As alleged, Bausch and Lomb developed certain marketing strategies in the mid-1970's in order to preserve its position in the original fitting and replacement markets. In particular, one strategy allegedly involved dividing accounts into categories according to the size or type or the customer. One such category consisted of chain store and other large quantity purchasers. A special program devised to service this category of accounts included, according to the plaintiffs, giving rebates directly to those accounts where it was necessary to obtain or retain their business.

Plaintiffs allege that Bausch and Lomb, in carrying out this program, quoted the same price per lens to all its customers who did not receive a rebate, and represented to them that Bausch and Lomb had only one price which it charged to all its customers. Nevertheless, Bausch and Lomb allegedly carried out its rebate program in secrecy. Plaintiffs say the payments to the chain store and large quantity customers varied according to the customer with respect to lenses, but amounted to a flat 25 percent rebate for accessories. Allegedly, checks for payment of the rebates or "kickbacks" were mailed directly to account representatives, who in turn delivered them to some representative or agent of the chain store or large quantity customer who controlled that customer's account.

Plaintiffs further allege that each of the chain store defendants, as well as other customers receiving secret rebates, were told that they were receiving better prices than any other accounts of Bausch and Lomb, and that each thus knowingly induced and received the payments in return for maintaining their level of purchases from Bausch and Lomb.

Finally it is alleged that each plaintiff and each member of the proposed class was and is in competition with one or more of the defendants receiving the secret rebates, and that each was injured at least to the extent of the difference between the price he was required to pay for the lenses and accessories and the price paid by the chain store defendants.

On the basis of these allegations, plaintiffs make certain antitrust claims. First, they claim that Bausch and Lomb has engaged in unlawful price discrimination in the sale of commodities in a manner that could substantially lessen competition, in violation of section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), and that the remaining defendants unlawfully received those discriminations in price, in violation of section 2(f) of that Act, 15 U.S.C. § 13(f).

Second, they claim that Bausch and Lomb gave secret rebates and kickbacks to the purchasing defendants, either directly to an agent of the purchaser or through some intermediary buyer in the transaction, and that these rebates constituted sham brokerage payments in violation of section 2(c) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(c).[1]

## II. *Rule 23(b)(3) and the Predominance of Common Questions*

The issue presently before this Court is whether the plaintiffs' proposed class, in the context of the particular claims made by plaintiffs, is capable of satisfying the requirements of Rule 23(b)(3).

As a prerequisite to the maintenance of a class action under Rule 23(b)(3), the court must find:

> that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

In order to find that common questions predominate, "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole must predominate over those issues that are subject only to individualized proof." *Nichols v. Mobile Board of Realtors, Inc.,* 675 F.2d 671, 676 (5th Cir.1982).

Defendants argue that individual questions of law or fact predominate over those common to the class members, and that class status should be denied for that reason; plaintiffs argue the contrary position.

To determine whether common or individual issues predominate, one must first identify the substantive law issues which are raised in the litigation. *Blue Bird Body,* 573 F.2d at 316. The present case, as already indicated, involves allegations of price discrimination through the payment of secret rebates by Bausch and Lomb to large quantity purchasers. These acts are principally alleged to violate sec-

1. In addition, plaintiffs assert several claims under the Sherman Act. They charge Bausch and Lomb, by itself and in combination with the other defendants, with monopolizing and attempting to monopolize, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. They also claim that Bausch and Lomb and the other defendants engaged in an unlawful combination in restraint of trade, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

In considering the class certification question, this Court has treated plaintiffs' claims as constituting primarily a Robinson-Patman price discrimination case. This approach is taken not out of myopia, but rather in accordance with the position taken by both plaintiffs and defendants in their arguments on this motion. *See* Brief of Defendant Bausch and Lomb in Support of Cross-Motion (Sept. 4, 1981) at 3. Plaintiffs and defendants have disputed whether the focus of the complaint is on section 2(a) or 2(c) of the Robinson-Patman Act, but neither party has placed any emphasis on the Sherman Act claims.

tions 2(a) and 2(c) of the Robinson-Patman Act.[2] Since this is a private lawsuit, plaintiffs must also fulfill the requirements of section 4 of the Clayton Act, 15 U.S.C. § 15, in order to recover.[3] The elements which a plaintiff must prove for recovery under this statute are: (1) a violation of the antitrust laws; (2) the injury or fact of damage causally linked to the violation; and (3) some indication of the amount of damage. *Nichols,* 675 F.2d at 675; *Perry v. Amerada Hess Corp.,* 427 F.Supp. 667, 674 (N.D.Ga. 1977). To establish "liability" for section 4 purposes thus means showing both antitrust violation and fact of damage. *Blue Bird Body,* 573 F.2d at 317. The term "fact of damage," which has been likened to the causation element in a negligence action, simply means that the antitrust violation caused injury to the plaintiff. *Id.*

In antitrust suits where class certification is sought, it is frequently the case that proof of the antitrust violation or conspiracy can be made in a generalized manner; at the same time, the question of damages is typically a matter for individualized proof. *See, e.g., Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454–55 (3d Cir.1977); *In re South Central States Bakery Products,* 86 F.R.D. 407, 420 (M.D.La.1980). And it is often said that the necessity for calculation of damages on an individual basis should not preclude class certification when the issues which determine liability are common to the class and these issues predominate. *See Bogosian,* 561 F.2d at 456. Consequently, the question whether common issues predominate is often regarded as turning upon whether or not the fact of damage, or "impact," can be established by generalized proof. *See, e.g., Blue Bird Body,* 573 F.2d at 320, 327; *South Central States Bakery,* 86 F.R.D. at 420. *Cf. Windham v. American Brands, Inc.,* 565 F.2d 59, 66 (4th Cir. 1977) (en banc) (issues of both injury and damage are "always strictly individualized").[4]

Having made these general remarks, this Court will proceed to discuss whether common or individual issues predominate in the present case, first in terms of the section 2(a) claim, and then the section 2(c) claim.

## III. *The Robinson-Patman Claims*

### A. *The Section 2(a) Claim*

Section 2(a) of the Robinson-Patman Act generally makes it unlawful for a seller to discriminate in price between purchasers of goods where the effect of the price differential may be substantially to lessen competition between the favored and disfavored customers. For the plaintiffs to recover under section 4 of the Clayton Act for an alleged antitrust violation such as this, they "must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981). That is, plaintiffs must show some actual anticompetitive injury to themselves. Thus, here they must prove that functional competition existed between themselves (the disfavored customers) and the favored customers, for without this element, no injury from price discrimination could be established. *Mekani v. Miller Brewing Co.,* 93 F.R.D. 506, 511 (E.D.Mich.

2. Although a violation of section 2(f), the provision dealing with buyer liability, is also alleged, a violation by the seller of section 2(a) must first be established to prove a violation of section 2(f). L. Sullivan, *Handbook of the Law of Antitrust* 704 (1977), *citing Automatic Canteen Co. of America v. FTC,* 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953). For that reason, the section 2(f) claim will not be referred to separately.

3. Section 4 provides in part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor. . . ."

4. Of course, proof of fact of damage and of the amount of damages are often closely related. For instance, in price-fixing cases, where class actions are frequently permitted, proof by a class member that he made a purchase at a supra-competitive price illegally fixed will establish fact of injury, while the amount of damages will be the difference between what the free market price would have been and the higher price paid. *South Central States Bakery,* 86 F.R.D. at 421.

1982); *Bel Air Markets v. Foremost Dairies, Inc.*, 55 F.R.D. 538, 540 (N.D.Cal.1972).

Because of this requirement, courts have consistently found section 2(a) claims ill-suited for maintenance as class actions. *See, e.g., Mekani v. Miller Brewing Co.*, 93 F.R.D. at 511; *Perry v. Amerada Hess Corp.*, 427 F.Supp. 667, 675 (N.D.Ga.1977); *Boro Hall v. Metropolitan Tobacco Co., Inc.*, 74 F.R.D. 142, 145 (E.D.N.Y.1977); *Chmielski v. City Products Corp.*, 71 F.R.D. 118, 171 (W.D.Mo.1976); *Kelly v. General Motors Corp.*, 425 F.Supp. 13, 20 (E.D.Pa.1976); *Bel Air Markets*, 55 F.R.D. at 541.[5] As the court in *Boro Hall* stated, "[e]ach class member's proof as to competitive injury and thus as to liability will be highly individualistic. For this reason the courts have generally denied class action motions in Robinson-Patman cases." 74 F.R.D. at 145.

The reasons why courts have taken this position are manifest. The geographic markets in which the injury to competition allegedly occurred are generally local in nature, multitudinous, and often spread over a large geographic area. The discrimination in price by which favored customers are benefitted may vary from one favored customer to another, and from one location to another. The seller has certain defenses available to it, such as cost justification and meeting competition, and their applicability may vary from one market to another. Next, there may be variance in the extent to which price benefits to favored customers are passed on by them in retail sales. Finally, the extent to which this will affect a particular class member, if at all, will vary according to the degree of competition which exists between the class member and the favored customer.

Each of these considerations which cause a finding of competitive injury in a price discrimination case to be a highly individualized matter, incapable of simple, formulaic proof, are applicable in the present case. Even if it is assumed that proof of an unlawful price discrimination scheme could be shown on a classwide basis, it still would be no simple matter to determine whether any particular class member has lost business or been otherwise injured in an anticompetitive fashion by the unlawful price discrimination. There are apparently some 52,000 optometrists, ophthalmologists, and dispensing opticians—all potential class members—all over the country, each in their own local markets. They may or may not be in competition with Searle, Pearle Vision, Cole, or any other unnamed large quantity purchaser from Bausch and Lomb. Since plaintiffs allege that the favored customers did not all receive the same price reduction, or rebate, there will be further variations on the effect on their businesses. And Bausch and Lomb may assert legitimate defenses which may obtain in any of these local markets. Under these circumstances, the kaleidoscopic prospect of tens of thousands of mini-trials on the issues of injury and damages renders this proposed class action an emblem of unmanageability.

B. *The Section 2(c) Claim*

Plaintiffs appear to recognize the difficulties in maintaining a class action in a section 2(a) claim.[6] They seek to avoid a denial of class status, however, with essen-

5. *Contra, Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791 (10th Cir.1970). That case presented a different set of circumstances from the present case, insofar as the proposed class numbered only in the several hundreds, and all the putative class members were located in a single state (Utah). More importantly, the case has been soundly criticized. *See, e.g., Kelly v. General Motors Co.*, 425 F.Supp. at 20 n. 7, where the court described *Gold Strike* as

> the only price discrimination case to our knowledge which has sanctioned the certification of a price discrimination class action. The Court in *Gold Strike* assumed the existence of competition between the favored and disfavored customers, which we respectfully suggest is improper, especially in view of the recent admonition of the Court of Appeals in *Unger v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3rd Cir.), cert. denied, [429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84] (1976), that plaintiffs may not shortcut elements of proof in class action cases.

6. That is, they recognize that courts have been unreceptive to motions for class certification in such cases. *See* Plaintiffs' Response to Cross-Motion of Defendant Bausch and Lomb to Dismiss Class Action Allegations (Oct. 7, 1981) at 9.

tially this two-step argument: (1) they say that this is predominantly a section 2(c) case;[7] and (2) they contend that since section 2(c) is unlike section 2(a) in that it is a *per se* violation, it does not face the same difficulties as section 2(a) in terms of proof of injury. Bausch and Lomb contest both facets of the argument.

Section 2(c) of the Robinson-Patman Act makes it unlawful for any person engaged in commerce

> to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).

Under the broad language of this section, all payments covered by it are unlawful, regardless of whether or not any adverse competitive effect occurs, so long as the payments are not made to compensate "for services rendered." L. Sullivan, *supra,* at 698. In this sense, the section creates a statutory *per se* rule. *Id.*[8]

Although section 2(c) may state a *per se* violation for which no showing of anticompetitive effect is required in a government enforcement action, in a private action brought under section 4 of the Clayton Act the requirement of antitrust injury still obtains. *See J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 485–89, 97 S.Ct. 690, 695–97, 50 L.Ed.2d 701 (1977). Following the approach in those cases, section 2(c) may be described as a prophylactic statute. Section 4, on the other hand, is a remedial provision, enabling plaintiffs to recover treble damages upon some showing of actual injury of the type the antitrust laws were intended to prevent. 429 U.S. at 489.

In *J. Truett Payne,* the Supreme Court considered the contention of the petitioner that once it has proved a price discrimination in violation of section 2(a) it would be

7. *See* Plaintiffs' Response to Defendant's Reply Brief in Opposition to Class Certification (May 21, 1982) at 2. Again, plaintiffs make passing reference to their Sherman Act claims, *id.* at 1 n. 1, but they offer no discussion of those claims or how the manner of proof for them would vary from the proof of their price discrimination claims.

8. Section 2(c) has generally been applied to two types of situations: (1) cases involving "dummy" brokerage payments, see, e.g., *FTC v. Henry Broch & Co.,* 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960); *Ideal Plumbing Co. v. Benco, Inc.,* 529 F.2d 972 (8th Cir.1976); and (2) commercial bribery cases, see, e.g., *Rangen, Inc. v. Sterling Nelson & Sons,* 351 F.2d 851 (9th Cir.1965); *Bunker Ramo Corp. v. Cywan,* 511 F.Supp. 531 (N.D.Ill.1981). Sham brokerage payments occur where large buyers set up "dummy" brokers who are employed by the buyer and who render no services; the large buyers then demand that the seller pay "brokerage" to the fictitious brokers who then turn it over to their employer. *Henry Broch,* 363 U.S. at 169, 80 S.Ct. at 1160. Since the statute also proscribes payments "in lieu" of brokerage, it means that large buyers who purchase directly from the seller and do not require the services of a seller's broker may not demand or receive price reductions equivalent to the seller's ordinary brokerage expenses in sales to other customers. *Id.* at 171, 80 S.Ct. at 1161. Commercial bribery occurs where a supplier bribes an agent or employee of a buyer, in order to ensure that that supplier and not another obtains the business of that buyer. *See Cywan,* 511 F.Supp. at 533. Section 2(c) does not cover all indirect price concessions. *Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1169 (7th Cir.1978).

This Court has some doubts as to the prominence of the plaintiffs' section 2(c) claim in the context of their factual allegations. For instance, the allegations do not make it entirely clear that the rebates were given *in lieu of* ordinary brokerage expenses or commissions. Nor is it apparent from the allegations that the rebate payments were given as bribes to agents of the chain store purchasers in order to obtain their business. Nevertheless, this Court will proceed on the assumption that a substantial section 2(c) claim has been raised.

entitled at a minimum to so-called "automatic damages" in the amount of the price discrimination. 451 U.S. at 561, 101 S.Ct. at 1926. The Court rejected that contention, and based its holding on the requirement of actual injury under section 4 of the Clayton Act. It appears, then, that the injury must be real and not presumed.

The same analysis would adhere with respect to a private plaintiff's allegation of a section 2(c) violation. Thus, the plaintiffs here must show essentially the same actual anticompetitive injury to themselves for their section 2(c) claim as they would for their section 2(a) claim. In referring to anti-competitive injury, this does not mean that plaintiffs would have to establish an overall reduction in competition in the markets in which they are located. *Cf. Klors, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). And of course, in establishing the violation, the defenses available to the seller under section 2(a) are not available under section 2(c). It does mean, however, that plaintiffs would have to show that they were in competition with one of the large quantity purchasers, and that their business was injured by the price benefit those purchasers received. As a result, essentially the same difficulties in proof of injury and damages described in connection with the section 2(a) claim apply here as well.

Plaintiffs here suggested, however, that to prove injury to themselves they are only required to show that they are in the "target area" at which the alleged anticompetitive acts of the defendants have been aimed. In so arguing, they have confused the issue of standing with that of the requisite proof of injury at trial. The test for standing in an antitrust suit is that the plaintiff must show that he is "within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Industrial Inv. Development Corp. v. Mitsui & Co.*, 671 F.2d 876, 886 (5th Cir.1982); *see Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 270 (5th Cir.1979). In this case, the plaintiffs, who allege they are purchasers from Bausch and Lomb in competition with other purchasers who received price reductions, clearly have standing. But to have standing is only a preliminary matter, a "first step"; it does not obviate the need to prove actual injury in order to recover. *See generally Mitsui*, 671 F.2d at 885–89. And in a class action, there must be some reasonable showing of injury as to each class member.

Because of the difficulties described, this Court concludes that plaintiffs' section 2(c) claim is also ill-suited for class action status.

III. *Conclusion*

In sum, this Court concludes that, under the circumstances described above, a class action cannot here be maintained for these Robinson-Patman claims. The consistency with which other courts have dealt with this issue in the past, at least in the context of section 2(a) claims, gives this Court assurance of the appropriateness of its having ruled solely on the basis of the pleadings and briefs of counsel. The court emphasizes that no appropriate and manageable manner of providing generalized proof of injury has been suggested by the plaintiffs. In the absence of such manner of proof, this Court cannot envision these claims as other than unwieldy Rule 23(b)(3) class action vehicles.

It is so ORDERED.