**In re SOUTH CENTRAL STATES BAK-ERY PRODUCTS ANTITRUST LITIGATION.**

**James L. MISSILDINE et al.**

**v.**

**IDEAL BAKING COMPANY OF PARIS, INC. et al. (Missildine I)**

**James L. MISSILDINE et al.,**

**v.**

**COTTON'S, INC. et al. (Missildine II)**

**MILLER'S FOOD CORP. et al.**

**v.**

**COTTON'S, INC. et al.**

**MDL No. 282.**
**Civ. A. Nos. P–75–14–CA, P–76–47–CA and 76–327.**

United States District Court,
M. D. Louisiana.

April 2, 1980.

Howard A. Specter and Michael D. Buch-wach, of Litman, Litman, Harris & Specter, Pittsburgh, Pa., Jim D. Lovett, Clarksville, Tex., Sam J. D'Amico, Baton Rouge, La., for James L. Missildine and McDonalds of Baton Rouge.

Phillip A. Wittmann and Stephen H. Kupperman, of Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for Wolf Baking Company, Inc.

CHARLES SCHWARTZ, JR., District Judge.

■ This litigation consists of three[1] private antitrust actions consolidated for pre-trial purposes by the Judicial Panel on Multidistrict Litigation under 28 U.S.C. § 1407 and transferred to this District.[2] Plaintiffs James L. Missildine and McDonald's of Baton Rouge, Inc., in their original complaints alleged that the defendant wholesale baking companies engaged from March 25, 1971, to November 5, 1976, in a combination or conspiracy to restrain trade in and fix prices of bakery products and that defendants implemented the alleged conspiracy by fixing wholesale prices, rigging bids, eliminating or reducing discounts, and by allocating customers and territories. All of the original named defendants except Wolf Baking Co., Inc., have entered into settlement agreements.[3] Counsel for McDonald's have acknowledged that there is no legal entity called "McDonald's of Baton Rouge, Inc." Therefore, McDonald's is an inadequate representative under Rule 23(a)(4)[4] and thus cannot represent the class.[5]

The Court has before it the motion of plaintiff, pursuant to Rule 23, F.R.C.P., for certification of these consolidated cases as a class action. The class sought to be represented by plaintiff is that of all persons who purchased bakery products from any defendant bakery company in a geographic area described by plaintiff as the "defined relevant market" at any time during the period from March 25, 1971 to March 25, 1975.[6] After consideration of the motions, the supporting and opposing memoranda submitted by the parties, and the oral arguments presented at a hearing concerning the class certification motion, the Court is of the opinion that these cases are suitable for class action treatment, that plaintiff Missildine is a proper class representative, and that the class should be certified.

## I. THE "DEFINED RELEVANT MARKET"

■ Plaintiff's complaints were framed to include claims of attempted monopolization and monopolization, but these claims were not pursued by plaintiff in his submitted memoranda, and, at a hearing on the motion to certify, the class plaintiff acknowledged that this is a price fixing case and not one of monopolization. This characterization of the case obviates any objection that plaintiff's use of the phrase

---

1. *James L. Missildine v. Ideal Baking Co. of Paris, Inc.*, (M.D. La. C.A. 77–283) (*Missildine* I); *James L. Missildine v. Cotton's, Inc.*, (M.D. La. C.A. 77–285) (*Missildine* II); *Miller's Corp. v. Cotton's, Inc.*, (M.D. La. C.A. 76–329).

2. *In re South Central States Bakery Products Antitrust Litigation*, 433 F.Supp. 1127 (Jud.Pan. Mult.Lit.1977).

3. Settlement agreements covering the same time period, class, and geographic area proposed by plaintiffs in their class certification motions have been entered into by plaintiffs with original named defendants Colonial Baking Co. of El Dorado, Colonial Baking Co. of Gulfport, Ideal Baking Co. of Paris, Inc., Hubal Baking Co., Inc., and the Cotton Companies, consisting of Cotton Bros. Baking Co., Inc., Cotton's, Inc., Cotton Baking Co., Inc., and Cotton's Ouachita Bakery, Inc.

4. An entity cannot sue under a pseudonym but rather must sue under its own name, as the real party in interest. F.R.C.P. 17(a); *Petition of*

*M/V Elaine Jones*, 480 F.2d 11, 25–26 (5th Cir. 1973), *cert. denied*, 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975).

5. Because only one defendant (Wolf Baking Co.) remains in the suit, and because plaintiff McDonald's of Baton Rouge, Inc. is an inadequate class representative, the Court will refer to both plaintiff and defendant in the singular, although their briefs, memoranda, motions and oral arguments were phrased, properly at the time, in the plural for both parties.

6. At the hearing on the motion to certify the class, plaintiff's counsel orally amended the relevant term period, but the parties are confused about the amended period. Plaintiff states that the amended period is from March 25, 1971 to March 25, 1975, while defendant understands that period to extend from March 25, 1971 to February 28, 1975.

"defined relevant market" in his definition of the class sought to be certified requires him to demonstrate a relevant market in the antitrust monopolization sense of the phrase. This is so because a "relevant market" in an antitrust monopolization sense need not be shown in a price fixing claim. Plaintiff apparently intended to use the phrase "defined relevant market" to indicate only the geographic boundary of the proposed class. Plaintiff does not claim that the defined relevant market is a geographic or product market in an economic or antitrust sense.

Defendant distinguishes from this defined relevant market several trade areas and relevant geographic markets. A "relevant market," defined on the basis of geographical boundaries, would be determined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it"; there might also exist sub-markets constituting product markets for antitrust purposes. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 24, 8 L.Ed.2d 510 (1962). The boundaries of such a submarket will be determined by such factors as "industry or public recognition of the submarket as a separate economic entity, . . . unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id. See Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964, 979–81 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). A relevant geographic market for bakery products would consist, typically, of a metropolitan area and a rural urban fringe. A trade area, as defined by defendant, is an area characterized by maintenance of prices different from those in nearby geographic areas for comparable products where a group of bakeries was in competition. Defendant states that within plaintiff's defined relevant market there existed numerous trade areas as well as several geographic markets.

The differentiation and delineation of several distinct and particular market areas is not material in an antitrust and monopolization sense because in this price fixing case the question before the Court is whether there was price fixing throughout the entire area for which plaintiff seeks·to certify the class. The "defined relevant market" as used by plaintiff was apparently meant as the geographical or spatial analogue to the relevant time period of the alleged price-fixing.

## II. THE BAKERY INDUSTRY

An analysis of the industry and an examination of the products, sellers, and buyers are required in order to decide correctly a Rule 23 class certification motion in an antitrust action. *Alabama v. Blue Bird Body Company, Inc.*, 573 F.2d 309, 312 (5th Cir. 1978) (*Blue Bird*). The discussion herein of the bakery industry is drawn from the comprehensive memoranda submitted by the parties, "Defendants' Joint Statement," and the record.

In the bakery industry there is variety among types of products and customers, purchasing methods, pricing arrangements, distribution methods, and geographic markets. Plaintiff defines bakery products, for the purposes of this litigation, as "all products ordinarily produced and/or sold by wholesale bakers," including "white sliced bread, whole wheat and other varieties of bread, rolls, buns, specialty items, cakes, sweet rolls and other confectionaries." There are several basic bakery product classifications: white bread and its components or types, including buns and rolls; private label breads; secondary label breads; and varieties of sweet goods, including cakes and wheat and rye breads. Private label products are those marketed under a label owned by the purchaser, typically a large store or chain of stores. Secondary label products are those marketed under an unadvertised label owned by a bakery. Other products were sold under trade names or premium labels owned and advertised by the bakeries. Within the basic product classifications there were numerous different items: in the aggregate, the bakery companies each sold hundreds of different items. The principal production items were white bread, buns and rolls.

The "defined relevant market" refers to that geographic area constituting the geographic definition or delineation of the proposed class. Wolf sold its products throughout parts of Louisiana, eastern Texas, and southeastern Arkansas, which constituted only part of the entire defined market. The bakeries had multiple baking facilities and no single facility produced all of the products distributed. The basic method of distribution was delivery by truck by route salesmen who delivered fresh bread obtained at a bakery or distribution center and then picked up stale goods. The service provided by salesmen with respect to private and secondary label products was often less extensive than that provided in connection with sales of premium label products.

Wholesale bakeries sold to three basic types of customers: (1) retailers, such as grocery stores and convenience stores; (2) restaurants; and (3) institutional purchasers, such as schools, hospitals, and government facilities. The overwhelming majority of customers were grocery stores or restaurants.

The wholesale bakeries maintained varied pricing arrangements and offered different types of customers different purchasing methods. Wholesale price lists were not uniform within the entire defined market; the bakeries maintained separate wholesale price lists for each trade area. For the same bakery products made by one bakery company, there was no uniformity in the wholesale list prices charged by each individual plant of that company or by the company in general. Further, each plant might have different geographical price zones. Customers who purchased small quantities of bakery goods ordinarily paid wholesale list prices. Some customers, but not all, received discounts, paying a lower price than the wholesale list price for one or more products. Discounts took various forms and were calculated in different ways. One was a percentage discount which consisted of percentage reductions of varying amounts from the wholesale price. This type of discount sometimes covered all products purchased by the customer, i. e., there was a percentage discount on the total volume of purchases, but sometimes only particular products or groups of products, e. g., bread products or sweet goods, were discounted. Another form of discount was a "cents-off" discount by which a customer received some number of cents off per unit of the wholesale list price of a particular product. Another type of discount involved discount payments of a fixed sum per month; this type of discount was generally used with credit customers. The amount of the discount varied among the customers of each bakery company, as did the forms or types of discounts. Some customers received a combination of more than one form of discount. Discounts were negotiated between the customer and the bakery on an individualized basis. Discounts to particular customers were not consistent in amount or existence; the amounts fluctuated, and discounts were initiated, removed, and reinstated throughout the relevant period.

Some purchasers bought at prices determined by submission of bids by the bakeries. The prices bid were often lower than the wholesale list price for other customers in the same trade area, although wholesale price was sometimes bid. The price bid was determined by factors such as the cost to the bakery of supplying a particular order and the bakery's need for the volume of production required for the bid. Only a small number of customers, mainly institutional purchasers, such as schools, hospitals and government facilities, bought at prices determined by bids.

Private and secondary label bakery products were sold to a limited number of customers, mainly large grocery stores, at prices individually negotiated between a bakery and the customer. Wholesale list prices for secondary label products generally differed from wholesale list prices for premium label products, and were nearly as diverse and varied. Prices for private label products sold to different private label customers were generally different from each other and were different from wholesale list prices. Apparently there was no uniform difference between wholesale list and

private label prices for similar products, because the amount of difference was determined by both the result of individualized negotiation and the competitive pressure from other bakeries for the business of private label accounts.

### III. REQUIREMENTS OF RULE 23

Rule 23(a), F.R.C.P., sets out the basic requirements for all class actions. It provides:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, plaintiffs must satisfy the requirements of Rule 23(b)(3):

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

■ Plaintiffs have the burden of establishing that each of these prerequisites to class action certification is satisfied. *EEOC v. D. H. Holmes Co.*, 556 F.2d 787, 791 (5th Cir. 1977), *cert. denied*, 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978).

In deciding this issue this Court, just as the Court in *In re Corrugated Container Antitrust Litigation*, 80 F.R.D. 244 (S.D. Tex. 1978) ("*Corrugated*"), is guided by the opinion of the Fifth Circuit Court of Appeals in *Blue Bird*, *supra*, which clarifies the sort of proof plaintiffs must adduce in order to satisfy the requirements of Rule 23(b)(3).

The Court will first consider the requirements of Rule 23(a).

As a preliminary matter, in order to better facilitate an understanding of some of defendant's objections to Missildine's claim that he is a proper class representative, the Court shall discuss the particular circumstances of Missildine's position as a purchaser of wholesale bakery products.

Plaintiff Missildine was owner of the Avery 7–11 Store in Avery, Red River County, Texas, which he purchased on December 10, 1973. Prior to that date, he had never purchased wholesale bakery products for resale. Thus for much of the relevant period, which ran from March 25, 1971 to March 25, 1975, he made no purchases of bakery products for resale in his convenience store. Missildine's total purchases of bakery products amounted to approximately $50.00 to $60.00 per week, and sales of bakery products totaled approximately three percent of the gross sales of the Avery 7–11 Store. Although Missildine purchased from two of the original named defendant bakery companies, he did not purchase from defendant Wolf Baking Co., Inc., which did not sell its bakery products in Avery, Texas, or Red River County during the relevant period.

Missildine apparently never attempted to shop competitively and did not compare prices when wholesale list prices were raised. He purchased only at straight wholesale list price for bakery products, never received or requested a discount from wholesale list price, never attempted to pur-

chase secondary or private label bakery products, and never solicited or received bids. He priced bakery products sold at the Avery 7–11 Store on a straight markup system.

## NUMEROSITY

■ Depositions of original named defendant bakery companies' executives reveal that the number of purchasers of bakery products from those companies in the alleged market during the relevant period was over 10,000. Defendant has not seriously questioned plaintiff's satisfaction of the numerosity requirement of Rule 23(a)(1). In the Court's view, joinder of the thousands of class members of the putative class would be impracticable, and accordingly, the Court finds that the requirements of Rule 23(a)(1) have been satisfied as to each.

## COMMONALITY

The requirement of Rule 23(a)(2), that there be questions of law or fact common to the class, must be distinguished from Rule 23(b)(3), under which such common questions must be shown to *predominate* over questions affecting only individual class members. The minimal commonality requirement of Rule 23(a)(2) has been characterized as superfluous in Rule 23(b)(3) actions. *In re Plywood Anti-Trust Litigation,* 76 F.R.D. 570, 578 (E.D.La.1976); 3B Moore's Federal Practice, ¶ 23.06–1 at 23–301.

■ Plaintiff's allegation that the wholesale bakeries combined unlawfully to fix the prices of bakery products within a defined area involves a common claim of illegal conduct. Plaintiff Missildine and each putative class member would be required to show the existence of a conspiracy to fix prices of bakery products. The existence, scope, and efficacy of the alleged combination and conspiracy are questions common to all putative class members. Price fixing conspiracy cases generally, because of the nature of the claims, involve common legal and federal questions concerning the existence, scope, and effect of the purported conspiracy. *In re Sugar Industry Antitrust Litigation,* 73 F.R.D. 322, 335 (E.D.Pa.

1976); *In re Ampicillin Antitrust Litigation,* 55 F.R.D. 269, 274 (D.C.D.C.1972). *See In re Plywood Antitrust Litigation, supra,* 76 F.R.D. at 578–79; *In re Independent Gasoline Antitrust Litigation,* 79 F.R.D. 552, 557 (D.Md.1978).

The Court finds that the requirement of Rule 23(a)(2) has been satisfied as to each purported class member.

## TYPICALITY

■ Rule 23(a)(3) requires that the claim of the representative be typical of the claims of members of the proposed class. Plaintiff Missildine, as well as purported class members, must establish the same elements of the price fixing claim, *i. e.,* the existence, scope, and efficacy of the alleged conspiracy, in order to prevail. The theory of liability upon which plaintiff proceeds and the type of relief sought are coextensive with those of the class members. Rule 23(a)(3) does not require perfectly identical claims; rather, what is required is that the claims be based upon the same legal or remedial theory and that there be no conflict of interest between the representative and class members. *Gonzales v. Cassidy,* 474 F.2d 67, 71 n. 7 (5th Cir. 1973). Factual variations between the claims of the class representative and those of some members of the class do not mandate a finding of a lack of typicality where the claims of the class and the representative arise out of the same legal and remedial theory. *E. g., Donaldson v. Pillsbury Co.,* 554 F.2d 825, 831 (8th Cir.), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); *Wofford v. Safeway Stores, Inc.,* 78 F.R.D. 460, 488 (N.D.Cal.1978). There need be no identical fact pattern, *Gerstle v. Continental Airlines, Inc.,* 50 F.R.D. 213, 219 (D.Colo.1970), and the interests of each member of the class need not be identical. *Green v. Wolf Corp.,* 406 F.2d 291, 299 (2d Cir. 1968), *cert. denied sub nom. Troster, Singer & Co. v. Green,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). However, where the legal and factual positions of the representative are "markedly different" from those of the class, even though there are common issues of law or fact, there may be a lack of

typicality under Rule 23(a)(3). C. Wright & A. Miller, Federal Practice and Procedure § 1764 (Supp.1978).

■ Factual variations may give rise to two typicality problems. First, such variations

> may require consideration of legal issues other than those common to the class. . . . [T]he common issues must occupy "essentially the same degree of centrality" to the named plaintiffs' claim as to that of other class members. [Citation omitted.] . . . [I]f it is predictable that "a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative." [Citation omitted.]

*Wofford v. Safeway Stores, Inc.,* supra, 78 F.R.D. at 488–89. Second, variations may disclose that there are differing interests between different groups of class members, which will affect an effective presentation of the claims. *Id.* at 489. The court in *Wofford* also noted that the typicality requirement of Rule 23(a)(3) "seems intended to reinforce the adequacy requirement [of Rule 23(a)(4)] by ensuring that the named plaintiffs' interests are sufficiently aligned with those of class members to assure that they not only can but will press each such claim to a full and equal extent." *Id.* at 475.

Rule 23(a)(3) has been read to require that the representative's claim be "squarely aligned in interest" with the purported class, *Harriss v. Pan American World Airways, Inc.,* 74 F.R.D. 24, 42 (N.D.Cal.1977), and that the representative's interest be "sufficiently parallel to the interests of the other class members to assure a vigorous representation of the class," *Donaldson v. Pillsbury Co.,* supra, 554 F.2d at 831. One court has stated the typicality test under Rule 23(a)(3) as requiring that "in the course of proving its own claim [representative] plaintiff must also prove the claims of the other members of the class." *Amswiss International Corp. v. Heublein, Inc.,* 69 F.R.D. 663, 667 (N.D.Ga.1975). The court there stated that a representative's claim

would not be typical "if it would require substantially more or less proof than required for the other members of the class." *Id.* In an antitrust case, "[s]ince the representative parties need prove a conspiracy, its effectuation, and damages therefrom— precisely what the absentees must prove to recover—the representative claims can hardly be considered atypical." *Minnesota v. United States Steel Corp.,* 44 F.R.D. 559, 567 (D.Minn.1968). *See In re Sugar Industry Antitrust LItigation,* supra, 73 F.R.D. at 336. In *Shelter Realty Corp. v. Allied Maintenance Corp.,* 75 F.R.D. 34, 39 (S.D.N.Y.1977), appeal dismissed, 574 F.2d 656 (2d Cir. 1978), an antitrust price fixing case, the court was confronted with a class representative representing a proposed class of purchasers of maintenance services. In finding sufficient typicality between the claims of the representative and putative class members, notwithstanding factual variations in the situation of various purchasers, the court stated that

> The fact that the purchases were not made from all of the defendants, or that all of the methods through which the conspiracy was allegedly effected were not utilized against the named plaintiffs, is not dispositive of their ability to represent the class.

Defendant argues that its position is supported by *Amswiss International Corp. v. Heublein, Inc.,* supra. In that case the representative plaintiff's claim was found not to be typical of the claims of the class in part because that purported representative was not required to prove one element that was essential to the claims of the class members. *Amswiss* was a securities nondisclosure case in which, under the representative's theory, his reliance upon nondisclosed facts was presumed, whereas the absent class members would have been required to prove their own reliance. Also, the representative was a victim of an alleged oral misrepresentation, while putative class members were not given such misrepresentations by defendants. Although the court in *Amswiss* stated that the representative's claims would not be typical where

those claims require substantially more or less proof than that required for the class, in the context of that case, this test meant no more than the representative had to prove all of the elements of the claims of class members. Because the *Amswiss* representative was proceeding on a theory of relief dissimilar to that of the class members with respect to the elements of proof required, typicality was lacking.

Plaintiff Missildine's claim is essentially that the bakery companies unlawfully combined or conspired to fix the prices of bakery products which they sold in common within a defined geographical area. The basic elements of Missildine's price-fixing claim, *i. e.*, the existence, scope, and efficacy of the alleged conspiracy, are the same elements that must be shown by all class members. His theories of liability and the type of relief sought are not different from those of the class. *See Corrugated, supra,* 80 F.R.D. at 247–48. Missildine as a representative plaintiff has an interest in establishing each of the above elements of a price-fixing claim, and this interest is sufficiently parallel to class members' interests to insure full representation of the class claims. *See Donaldson v. Pillsbury Co., supra,* 554 F.2d at 831; *Sullivan v. Chase Investment Services of Boston, Inc.,* 79 F.R.D. 246, 257 (N.D.Cal.1979). He has asserted that he will seek to prove effectuation of price fixing implemented by means of bid rigging, discount elimination, and wholesale price increases, even though he apparently purchased only at wholesale list prices, in order to show the scope of the conspiracy as well as the alleged conspirators' motive and intent.

Missildine sues on the basis of alleged illegal price-fixing activities and seeks damages for the artificially inflated prices of bakery products that were allegedly paid by the similarly situated purchasers who are members of the putative class, and thus his price fixing claim is typical of the claims of the class. *See In re Sugar Industry Antitrust Litigation, supra,* 73 F.R.D. at 336; *Minnesota v. United States Steel Corp., supra,* 44 F.R.D. at 567. Although

various purchasers of bakery products, members of the proposed class, bought through different mechanisms, *e. g.*, bidding, negotiation, and wholesale price lists, the essential claim of both Missildine and the class members is that the prices paid were established by combination or conspiracy. The mere fact that all of the methods through which the alleged conspiracy was effected were not used with respect to Missildine, or the fact that Missildine did not purchase from all defendants, does not determine that the claim of Missildine lacks typicality under Rule 23(a)(3). *See Shelter Realty Corp. v. Allied Maintenance Corp., supra,* 75 F.R.D. at 39.

The Court finds that the claim of Missildine is typical of the claims of all class members.

REPRESENTATIVENESS

Rule 23(a)(4) requires a showing that the representative will fairly and adequately protect the interests of the class. Both the adequacy of the representative and the adequacy of his counsel must be established. *Gonzales v. Cassidy, supra,* 474 F.2d at 72 & n. 10; *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2nd Cir. 1968). The test of adequate representation is whether the representative has a sufficient interest in, and nexus with, the class to insure vigorous prosecution of the action. *Roper v. Consurve, Inc.,* 578 F.2d 1106, 1112 (5th Cir. 1978); *appeal pending,* 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979); *Huff v. N. D. Cass Co. of Alabama,* 485 F.2d 710, 714 (5th Cir. 1973); *Gonzales v. Cassidy, supra,* 474 F.2d at 72.

In determining whether a party would be an adequate class representative, courts have also inquired whether the representative's interests are coextensive with those of the class, *i. e.*, whether there is a nexus between the representative's interests and the class's interests, whether the representative's interests are antagonistic to the class's interests, and whether there is adequate financial support from the repre-

sentative for the litigation. *See* 3B Moore's Federal Practice ¶ 23.08[1], at 23–203, ¶ 23.-07[1.–1], at 23–218 (1979). The Court must "carefully scrutinize" the adequacy of representation. *Gonzales v. Cassidy, supra,* 474 F.2d at 75 n. 15, *quoting Eisen v. Carlisle & Jacquelin, supra,* 391 F.2d at 562; *National Ass'n of Regional Medical Programs, Inc. v. Mathews,* 551 F.2d 340, 344–45 (D.C. Cir. 1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977). This weight that must be given to Rule 23(a)(4)'s requirement of adequate representation flows from the requirements of due process. *See Hansberry v. Lee,* 311 U.S. 32, 44–45, 61 S.Ct. 115, 119, 85 L.Ed. 22 (1940).

■ As defendant has conceded, counsel for plaintiff are adequate and will be able to fairly represent the class. There is no antagonism between the interests of Missildine and the interest of other class members. Defendant argues that because Missildine never received a discount, and never entered into any other special pricing arrangement, his interest as a purchaser at straight wholesale list price was antagonistic to the interests of other class members who were different types of purchasers. Plaintiff, however, is asserting by his price fixing claim that the wholesale bakery companies illegally agreed to fix prices for each of the types of purchasers included in the proposed class. Plaintiff claims that *each* type of purchaser within the defined geographic area who bought at prices that were illegally fixed by the bakeries' combination or conspiracy was injured by the conspiracy, even though these purchasers bought through different pricing mechanisms. If, as plaintiff contends, the prices of bakery goods paid by each type of purchaser were illegally fixed, there would be no antagonism between the interests of Missildine and the class members.

■ A naked allegation of antagonism cannot defeat class certification; there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit. *Green v. Wolf Corp., supra,* 406 F.2d at 299; *Robertson v. National Basketball Ass'n,* 389

F.Supp. 867, 899 (S.D.N.Y.1975); *First American Corp. v. Foster,* 51 F.R.D. 248, 250 (N.D.Ga.1970). The Court finds that no such showing has been made.

■ Class representative Missildine has demonstrated to the Court his awareness of his financial obligations to the class and has sufficiently indicated to the Court his willingness and ability to finance the costs of this litigation, including sending notice to the class. Missildine's testimony and the assurance of his counsel satisfy the Court that the financial requirements that might be imposed upon the class representative will be adequately met. The important factors with respect to the class representative's financial resources are his ability to finance the cost of notice to absent class members and to retain vigorous and effective counsel. *Shelter Realty Corp. v. Allied Maintenance Corp., supra,* 75 F.R.D. at 39–40. Plaintiff's assertion of his awareness of his financial obligation and his willingness to assume it is sufficient to establish his Rule 23(a)(4) capacity to finance this class action. *Sanderson v. Winner,* 507 F.2d 477, 479 (10th Cir. 1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1573, 43 L.Ed.2d 780 (1975).

■ The amount of plaintiff's financial interest in the suit is not determinative of his ability to represent the class adequately, because one of the purposes of the class suit is to make possible vindication of claims which, taken individually, would be too small to justify legal action. *Eisen v. Carlisle & Jacquelin, supra,* 391 F.2d at 563.

■ In an antitrust price fixing case in which the class representative has alleged a broad conspiracy, courts have not required, for a showing of Rule 23(a)(4) adequate representation, that the representative have purchased from all of the defendants or that he have been adversely affected by all of the means and methods by which the alleged conspiracy was implemented. *Shelter Realty Corp. v. Allied Maintenance Corp., supra,* 75 F.R.D. at 39. Similarly, the fact that Missildine is attempting to represent a class with claims dating back to the beginning of the alleged

conspiracy beginning in 1971, although he first purchased wholesale bakery goods in 1973, does not render him an inadequate representative.

> [T]ypical and adequate class representation does not necessarily require that the representative have made purchases throughout the entire alleged period of conspiracy. Plaintiffs allege a single, continuing price-fixing conspiracy . . . . Although plaintiffs' claims for damages may not extend throughout the entire period, the court is confident that plaintiffs will fairly and adequately attempt to present evidence of violation and impact throughout the period [of the alleged conspiracy].

*In re Independent Gasoline Antitrust Litigation, supra,* 79 F.R.D. at 557–58. *But see J. W. T., Incorporated v. Joseph E. Seagram & Sons, Inc.,* 63 F.R.D. 139, 143 (N.D.Ill. 1974).

The Court finds that Missildine is an adequate class representative under Rule 23(a)(4).

## PREDOMINANCE OF COMMON QUESTIONS

Under Rule 23(b)(3), plaintiff must establish that questions of law or fact common to the class (the existence of which is a prerequisite to a class action under 23(a)(2)) predominate over questions affecting only individual members.

 In order to recover treble damages under his private antitrust claim, plaintiff must establish the existence of a violation or conspiracy, impact or fact of injury, and some indication of the amount of damage. *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir.), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). Both the existence of a violation and the existence of fact of injury or impact must be shown in order to establish liability in an antitrust case. *Id.* "Whatever the nature of the alleged conspiracy . . . injury is the *sine qua non* for stating a cause of action." *Shumate & Co., Inc. v. National Ass'n of Securities Dealers, Inc.,* 509 F.2d 147 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46

L.Ed.2d 97 (1975). A showing of impact or fact of injury means nothing more than establishing a causal link between the conspiracy and the alleged injury. *Response of Carolina, Inc. v. Leasco Response, Inc.,* 537 F.2d 1307, 1321 n. 34 (5th Cir. 1976); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3d Cir. 1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

 Determination of the amount of each class member's damages will necessarily require some individualized treatment. However, the mere existence of individual questions relating solely to the amount of damages will not defeat an antitrust treble damage claim. *Corrugated, supra* ; *Windham v. American Brands, Inc.,* 539 F.2d 1016, 1021 (4th Cir. 1976), *cert. denied,* 434 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); *Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791, 798 (10th Cir. 1970); *Shelter Realty Corp. v. Allied Maintenance Corp., supra,* 75 F.R.D. at 37. The necessity for calculation of damages on an individual basis will not defeat class certification where the common issues that determine liability predominate. *Bogosian v. Gulf Oil Corp., supra,* 561 F.2d at 456; *In re Sugar Industry Antitrust Litigation,* 1977–1 Trade Cases ¶ 61,373 at 71,335; *In re Master Key Antitrust Litigation,* 70 F.R.D. 23 (D.Conn.), *appeal dismissed,* 528 F.2d 5 (2d Cir. 1975).

Defendant's argument is essentially that the issues of existence and impact of a conspiracy cannot be shown on a classwide basis through common or classwide proof, and that therefore these issues would require individualized treatment. This argument is based upon defendant's characterization of the wholesale bakery industry, *i. e.,* upon a contention that the complexity of price structure, trade areas, and types of purchasing arrangement make it necessary for individualized proof of conspiracy, impact, and damages, thereby making it impossible for common issues to predominate.

 The Court is guided in its opinion by *Blue Bird, supra.* The Fifth Circuit observed generally that "there are no hard and fast rules" with respect to the propriety

of class certification in antitrust cases and "[t]he unique facts of each case will generally be the determining factor governing certification." 573 F.2d at 316. *Blue Bird* emphasized that in order to satisfy the predominance requirement, not only must it be shown that there are predominating questions that all the class must prove, but it must also be shown that these predominating questions are susceptible of classwide proof. In particular, *Blue Bird* stated that fact of injury or impact is an essential part of liability and that

"impact" is a question unique to each particular plaintiff and one that must be proved with certainty. That does not mean of course that cases do not exist wherein this requirement of certainty cannot be established by some sort of classwide proof.

*Id.* at 327.

In *Blue Bird* the trial court's certification of a national class of school bus purchasers was reversed, although certification of a statewide class was affirmed, because of a lack of facts or evidence in the record to demonstrate the possibility of classwide proof, *i. e.*, to demonstrate how plaintiffs could proceed with generalized proof as to the national class. *Blue Bird* held that the district court erred in concluding that proof of the violation or national conspiracy was a question common to the class because there was insufficient evidence presented by plaintiffs to show how they intended to establish the national conspiracy. *Blue Bird* made it clear, however, that the requirement that impact be shown by classwide proof does not as a matter of law defeat class certification.

▇▇▇ Missildine must establish that a conspiracy covering the defined relevant market existed in order to recover, and he asserts that he will be able to offer generalized, classwide proof of the conspiracy. To this end, he indicated to the Court that his intended proof will include testimony of former representatives of defendant and pricing records of defendant. The Court need not evaluate the merits of plaintiff's claim in order to determine the propriety of class certification, although an examination of plaintiff's proposed proof against the background of the nature of the wholesale bakery industry is mandated by *Blue Bird*. The Court must consider the evidence as concerning existence of the alleged conspiracy in order to determine whether this type of evidence is suitable for classwide use. Here, as in *Corrugated*,

The court is persuaded that the conspiracy issue—whether price information was exchanged; if it was, with what intent; whether action was taken by the defendants based upon such exchanges; etc.—is susceptible of generalized proof, since it deals primarily with what the defendants themselves did and said.

*Corrugated, supra,* at 250.

▇▇▇ The Court thus finds that the question of the antitrust violation can be shown by proof common to the class and that individualized proof will not be required.

The Court, having found that proof of the violation or conspiracy can be made in a generalized manner, and noting that the question of the amount of damages requires individual treatment, must next address the question of proof of impact with respect to the question of predominance of common issues.

The particular question before this Court was addressed in *Blue Bird*, where the Fifth Circuit stated that if "proof of impact as to each member of the plaintiffs' class could be made in a generalized manner" and would not be necessary on an individualized basis,

then the conspiracy issue might well predominate over all other individual issues. But, if generalized proof of impact is in fact improper, then the district court must carefully consider whether this requirement does not defeat the class certification on either predominance or manageability grounds.

*Blue Bird supra,* at 324.

In this case defendant argues that the price fluctuations and the variety of products, discounts, and types of customers and purchasing methods render it impossible for

plaintiff to prove impact in any generalized, classwide manner, and that an individual examination involving each class member would be required. The Court is instructed on the question of impact by *Blue Bird*, which stated the plaintiff must show that the alleged conspiracy was implemented with respect to him and that the conspiracy in fact injured him.

> This proof of injury [impact] in a price-fixing case will generally consist of some showing by the plaintiff that, as a result of this conspiracy, he had to pay supra-competitive prices for school buses. If there was some uniformity in the quality and price of a school bus, then this requirement of 'impact' might cause few problems.

*Id.* at 328.

Uniformity of quality, just as in *Corrugated*, does not present a problem of the degree of difficulty confronted in *Blue Bird*. As reflected in the affidavit of plaintiff's economist, Dr. Ralls, bakery products of the type sold by the bakery companies are fungible, substitutable, and homogeneous. The non-uniformity of price which existed in this case (and which is inevitable over a four year period) does not by itself defeat class certification. *Corrugated.* As *Blue Bird* emphasized, "We are not attempting, however, to hold as a matter of law that the impact requirement in the case before us defeats any possibility of a class certification." 573 F.2d at 328.

In cases where there is a variety of products, pricing methods, purchasers, and trade areas, or where prices fluctuate during the conspiracy, the traditional manner of proof of impact—proof of conspiracy plus proof of purchase constituted sufficient evidence of impact—has been refined. *Corrugated, supra*, 80 F.R.D. at 250. Despite the complexity or variety of products, purchasers, pricing methods, and trade areas,

> there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates *some* damage to each individual. Whether or not fact of damage can be proven on a common basis

therefore depends upon the circumstances of each case.

*Bogosian v. Gulf Oil Corp., supra*, 561 F.2d at 454, *quoted in Blue Bird, supra*, 573 F.2d at 325 (emphasis added). *Blue Bird* quoted *Bogosian*, with apparent approval, with respect to how plaintiffs could establish the propriety of generalized proof.

> If . . . [a] conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that . . . the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "[The] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by . . proof of some damage flowing from the unlawful conspiracy. . . ." *Zenith Radio [Corp. v. Hazeltine Research, Inc.], supra*, 395 U.S. [100] at 114, 89 S.Ct. [1562] at 1571 n. 9 [23 L.Ed.2d 129].

561 F.2d at 455, *quoted at* 573 F.2d at 325–26 n. 31.

"In a price-fixing case, it would seem that [the] classwide proof [of impact] would have to be coupled with—or it may consist entirely of—proof of purchase." *Blue Bird*, 573 F.2d at 327 n. 34. Plaintiff argues, and defendant appears to concede, that proof of a single purchase by a class member at a supra-competitive price illegally fixed or proof of elimination of a single discount to a customer who previously received discounts would constitute proof of impact and injury to that class member. That is, defendant admits that plaintiff can prove im-

pact by showing that as a result of the alleged conspiracy, the price actually paid in one or more specific transactions was supra-competitive or higher than it would have been absent the alleged agreement.

Plaintiff has represented to the Court that he will rely upon three forms of proof of impact than are allegedly common to the class: (1) testimony of present and former officers and employees of the bakery companies; (2) the bakery companies' pricing records; and (3) economic testimony from Dr. Ralls, plaintiff's economist. With respect to use of pricing records, plaintiff has asserted that documents are available to show what products were sold to whom, and how they were sold and at what price.

The Court has carefully considered the affidavit of Dr. Ralls, who asserts that proof of impact "can be determined on a classwide basis with a reasonable degree of economic certainty." Dr. Ralls examined the depositions and memoranda of the parties, and reviewed documents submitted by plaintiff to show the manner of proof plaintiff intends to use to prove impact. In his analysis he assumed as true the existence of facts stated by plaintiff, and stated that, in his opinion, "a combination or agreement among these defendants to discuss and exchange price information relative to discounting and elimination of discounts would have the effect of fixing, raising or stabilizing the prices of bakery products at artificially high levels wherever two or more of the defendants sold bakery products." Dr. Ralls then discussed methods of proof of impact:

> The overcharge, or the differential between the supra-competitive prices established by the Defendants and the prices which should or would have been charged in a free and competitive market, may be established by using at least one of four methods or a combination of these four methods . . . .

The first method discussed by Dr. Ralls would determine the supra-competitive price on the basis of a comparison of different prices in one geographic area as opposed to other relatively nearby geographic areas; those prices shown to be higher than the minimum price prior to price increases resulting from the meetings and discussions of the bakery companies would be supra-competitive prices. It is noted that Dr. Ralls expressly took into consideration the possible existence of differing production costs in different areas.

The second method would compare the defendant's prices and profits during the conspiracy with the prices and profits of non-defendant non-conspirators who sold comparable products in the same geographic area. The third method is similar to the second; damages would be determined by referring to prices in comparable markets or geographical area when prices reflected the free market price uninfluenced by artificial pricing practices.

Finally, Dr. Ralls stated another method of proving impact; damages could be measured by comparing the defendant's prices or profits during the conspiracy with those after termination of the conspiracy, in accordance with "generally accepted econometric procedures."

Dr. Ralls concluded:

> Impact, or the individual fact of damage to individual class members, can be determined from the Defendants' or class members records simply by showing that class members purchased bakery products from a Defendant at the supra-competitive price or that class members had discounts removed or reduced following discussions of elimination of discounts by Defendants. This is a relatively simple, almost clerical, process.

Defendant objects that Dr. Ralls's opinion on the availability of reasonable methods of classwide proof of impact is based on the assumption that implementation of the conspiracy will be shown by evidence other than his proposed methods. That is, the objection is that Dr. Ralls's methods will be unable to specify *which* prices of which bakery products were affected by the alleged conspiracy. Plaintiff responds by stating that Dr. Ralls's affidavit was offered for the limited purpose of demonstrating that manageable methods of deal-

ing with impact and damages can be utilized after it is established that a conspiracy was implemented in the defined relevant market. Plaintiff's proposed evidence will consist in part of testimony of bakery company officers and employees, and in part of bakery company records concerning meetings for the purpose of fixing prices in the defined relevant market. The prices agreed upon at these alleged meetings would represent the supra-competitive prices, and proof of any purchase at those prices would demonstrate impact.

■ Defendant's fundamental objection to plaintiff's proposed means of generalized proof of impact, especially the methods set forth by Dr. Ralls, is that plaintiff cannot prove what he intends to prove. Defendant's position is inconsistent with the rule that a court shall not prejudge the merits of a case in determining the propriety of class certification. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Miller v. Mackey International*, 452 F.2d 424, 427 (5th Cir. 1971). The question before the Court is not whether plaintiff will prevail on the merits, but rather whether the requirements of Rule 23 are satisfied.

■ The Court is convinced that plaintiff's showing of his proposed manner of proceeding with generalized and class-wide proof of impact is sufficient to support a finding that questions of law or fact common to the class predominate over questions affecting only individual members, thus satisfying the predominance requirement of Rule 23(b)(3). Common questions need not be dispositive of all issues in the litigation or of every claim of every class member. *Campus Cleaners, Inc. v. Dallas Tailor & Laundry Supply Co.*, 1977–2 Trade Cases ¶ 61,714 at 72,912 (S.D.Tex.1977); *Shelter Realty Corp. v. Allied Maintenance Corp.*, *supra*, 75 F.R.D. at 37; *Illinois v. Harper & Row Publishers, Inc.*, 301 F.Supp. 484 (N.D.Ill.1969); *Siegel v. Chicken Delight, Inc.*, 271 F.Supp. 722 (N.D.Cal.1967).

SUPERIORITY; MANAGEABILITY

■ Rule 23(b)(3) requires that the court find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The factors to be considered by the court include the interest of class members in individually controlling the action, the extent and nature of pending litigation concerning the controversy, the desirability of consolidating litigation of the claims in the forum, and the difficulties the court will face in the management of a class action.

■ In addition, the Court in making a final assessment should be, and is, mindful of the following principles. In order to effectuate federal policy with respect to private enforcement of anti-trust laws courts have held, and still hold, that the determination of the issues of class certification should in doubtful cases be resolved in favor of certification. *See Corrugated*, *supra* at 252, and cases cited therein. Moreover, the dismissal of a class action for management reasons is disfavored, *e. g.*, *Yaffe v. Powers*, 454 F.2d 1362, 1365 (1st Cir. 1972); *Corrugated*, *supra*, 80 F.R.D. at 253; *Shelter Realty Corp. v. Allied Maintenance Corp.*, *supra*, 75 F.R.D. at 38, and dismissal for such reasons "should be the exception rather than the rule." *Manual for Complex Litigation*, Part I § 1.43 n. 72 (1977).

Specifically, the Court concludes:

■ (A) Since the Judicial Panel on Multidistrict Litigation has consolidated the actions in this case and has transferred them to this District, there are no problems concerning litigation pending in other courts, the possibility of inconsistent adjudications, or concerning consolidation.

(B) Although this case, as a class action, will involve management difficulties, proper judicial management is feasible and should result in corresponding efficiencies. Judicial economy would best be served by this consolidated action in which all claims herein are being litigated. The potential burden of multiple suits and duplicative efforts by the parties are eliminated by this

class action. C. Wright & A. Miller, Federal Practice and Procedure § 1779, at 60 (1972).

(C) It has not been argued and it does not appear that individual members of the class would have a strong interest in maintaining separate proceedings for the adjudication of their claims.

(D) Having determined that the prerequisites of Rule 23(a) have been satisfied, that common questions predominate, and that plaintiff has relevant classwide proof to proffer with respect to such, the Court concludes that a class action is superior to other means of proceeding for the fair adjudication of their claims.

(E) Considering the factors enumerated concerning the superiority requirement of 23(b)(3), the advantages of a class action herein outweigh possible class members' interests in maintaining individual actions, including the alternative of the institution of individual actions.

(F) The forum chosen for the action represents an appropriate place to settle the controversy taking into consideration the residence and location of the interested parties, the availability of witnesses, evidence and documentary proof.

Accordingly, the requirements of Rule 23(a) and Rule 23(b)(3) having been satisfied, plaintiff James L. Missildine's motion for a determination of class action of the matters delineated as "Missildine I" and "Missildine II" is hereby GRANTED, and the action shall be maintained as a class action on behalf of all persons (excluding defendant and all subsidiaries of defendant) who purchased bakery products from defendant at any time during the period from March 25, 1971 to March 25, 1975 within the following described geographical areas: All of Louisiana, with the exception of New Orleans and part of the surrounding area (specifically, the Parishes of Jefferson, Orleans, Plaquemines, St. Bernard, St. Charles and part of St. Mary other than the towns of Morgan City, Berwick, Calumet, Patterson, Centerville, Garden City, Franklin, Baldwin, Charenton, Adeline and Louisa are without the marketing area); the Counties of Bowie, Cass, Harrison, Marion, Panola, Red River and Shelby in Texas; the Counties of Hancock and Pearl River in Mississippi; and the Counties of Ashley, Columbia, Hempstead, Lafayette, Little River, Miller and Nevada and that part of Howard encompassing the towns of Tollette, Mineral Springs and Nashville in Arkansas.

On or before May 2, 1980, counsel for the parties shall confer and attempt to agree upon a proposed form of notice, consistent with the requirements of Rule 23(c)(2); if the parties are unable to agree upon a proposed form of notice on or before May 2, 1980, the plaintiff and the defendant shall submit to this Court their proposed forms of notice, together with supporting memoranda dealing with areas of substantive dispute.

The Court reserves the right at any stage of these proceedings to designate subclasses pursuant to Rule 23(c)(4) if it becomes appropriate to do so. The Court further reserves the right to amend, alter and reform this Order at any time.

While it is conceded that McDonald's of Baton Rouge, Inc. is not a proper class representative, and even though the Court has determined that Missildine alone is an adequate class representative, the Court has authority to permit intervention or substitution of an adequate class representative. *In re Nissan Motor Corp. Antitrust Litigation*, 82 F.R.D. 193, 196 (S.D.Fla.1979).

Accordingly, McDonald's of Baton Rouge, Inc.'s claims are hereby dismissed without prejudice, and leave is hereby granted to substitute in its stead one or more plaintiffs within 30 days from date hereof.